**Kathryn MOSER and National Association of Telecomputer Operators, Plaintiffs,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, a federal agency, and Alfred C. Sikes, in his capacity as Chairman of the Federal Communications Commission, Defendants.**

Civ. No. 92–1408–AS.

United States District Court, D. Oregon.

Dec. 22, 1992.

Charles Hinkle, Julianne Ross Davis, Stoel Rives Boley Jones & Grey, Portland, OR, for plaintiffs.

Charles H. Turner, U.S. Atty., Herbert C. Sundby, Asst. U.S. Atty., Portland, OR, Jane E. Mago, Asst. Gen. Counsel, James M. Carr, Counsel, F.C.C., Washington, DC, for defendants.

## OPINION

REDDEN, Chief Judge:

Plaintiffs move for a preliminary injunction enjoining defendants from enforcing 47 U.S.C. § 227(b)(1)(B), a federal statute that prohibits using an artificial or prerecorded voice to deliver some commercial messages to residential telephone lines without the consent of the called party. For the reasons that follow, injunctive relief is granted.

## BACKGROUND

Plaintiff Kathryn Moser operates a chimney sweeping business with her husband in Keizer, Oregon. She also is president of the National Association of Telephone Operators, the other plaintiff, which represents small businesses that use telecomputer marketing. The defendants are the Federal Communications Commission ("FCC") and its chairman.

One year ago, Congress enacted the Telephone Consumer Protection Act of 1991 ("TCPA"), which amended the Communications Act of 1934 to restrict telephone solicitation techniques. The amendment provides in part:

(b) RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT—

(1) PROHIBITIONS—It shall be unlawful for any person within the United States—

\* \* \* \* \* \*

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under Paragraph (2)(B). . . .

47 U.S.C. §§ 227(b)(1)(B). The FCC recently promulgated regulations for implementing these restrictions, and under the statute's terms, the restrictions and the implementing regulations were to go into effect 20 December 1992.

This court conducted a hearing on 17 December 1992 on plaintiffs' motion for injunctive relief, at which plaintiff presented evidence and testimony. Defendants raised jurisdictional challenges, which are addressed below, and presented argument in opposition to plaintiffs' motion, but submitted no evidence or testimony.

## STANDARDS

To obtain preliminary injunctive relief in the Ninth Circuit, a party must meet one of two alternative tests. Under the "traditional" test, preliminary relief may be granted if the court finds:

(1) the moving party will suffer irreparable injury if the preliminary relief is not granted;

(2) the moving party enjoys a likelihood of success on the merits;

(3) a balancing of hardships favoring the plaintiff;

(4) the advancement of the public interest favors granting injunctive relief.

*Burlington N. R. Co. v. Department of Revenue*, 934 F.2d 1064 (9th Cir.1991).

Under the alternative standard, the moving party may meet its burden by showing either (1) probable success on the merits and the likelihood of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Associated General Contractors, Inc. v. Coalition for Economic Equity*, 950 F.2d 1401 (9th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). These formulations "represent two points on a sliding scale in which the required degree of irreparable harm increases as the

probability of success decreases." *United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 174 (9th Cir.1987). The Ninth Circuit has said that this really describes one test: "a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *San Diego Committee Against Registration & Draft v. Governing Bd. of Grossmont Union High School Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986).

## JURISDICTION

Defendants concede that jurisdiction exists here to challenge enforcement of the TCPA itself, but argue that the proper defendant is the United States, not the FCC. Additionally, the circuit courts have exclusive jurisdiction to review and stay FCC regulations. 28 U.S.C. § 2341; 47 U.S.C. § 402(a); *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984). To the extent plaintiff seeks to stay the enforcement of FCC's regulations, (and not the TCPA), jurisdiction rests with the Court of Appeals. *Information Providers' Coalition for Defense of the First Amendment v. FCC*, 928 F.2d 866 (9th Cir.1991).

■ Plaintiffs' Amended Complaint clarifies that they assert constitutional claims against the statute, not the FCC's regulations. After hearing argument from both parties, this court is satisfied that plaintiffs are challenging the TCPA, and can properly exercise jurisdiction for declaring the statute unconstitutional.

## ARGUMENT

### a. Serious Questions

■ Where a challenged regulatory scheme restricts only commercial speech (as here), the first amendment requirements are less strict than the protections afforded other types of speech. *Washington Mercantile Asso. v. Williams*, 733 F.2d 687 (9th Cir.1984); *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). A restriction on commercial speech passes constitutional muster if it directly advances a substantial governmental interest in a manner that is no more extensive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 563–64, 100 S.Ct. at 2350. In *Central Hudson*, the Court also stated that "[w]e review with special care regulations that entirely suppress commercial speech in order to pursue a nonspeech related policy." *Id.* at 566 n. 9, 100 S.Ct. at 2351 n. 9.

More recently, the Court has said that restrictions on commercial speech should (1) implement a substantial governmental interest; (2) directly advance that interest; and (3) be narrowly tailored to achieve the desired objective. *Board of Trustees v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). The *Fox* Court interpreted *Central Hudson's* language that a regulation must not be more extensive than necessary as requiring a "reasonable fit" between the ends promoted by the regulation and the means chosen by the regulation for that promotion. *Id.* at 480, 109 S.Ct. at 3034.

Some of the findings by Congress under Section Two of the TCPA describe the substantial governmental interests the statute targeted: unrestricted telemarketing "can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety;" § 2(5); "Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices;" § 2(9); "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy;" § 2(10); "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion;" § 2(12).

Plaintiffs concede that this concern for "protection of citizens' privacy is a legitimate governmental interest." Plaintiffs' Memorandum in Support, p. 11. After receiving evidence and the parties' arguments before this court at the 17 December 1992 hearing, two conclusions appear beyond dispute: first, that the TCPA affects commercial speech and must therefore pass muster under the scrutiny of the constitutional protections given commercial speech, and second, that the government's interests prompting the TCPA are substantial.

Accordingly, the motion for injunctive relief requires the court to decide whether plaintiffs' challenges raise serious questions regarding whether the TCPA is sufficiently narrowly tailored to achieve the desired objective of enhancing residential privacy, *i.e.*, whether the statute effects a reasonable fit between the extent to which it achieves its objective and the burden it places on commercial speech. In *Discovery Network, Inc. v. Cincinnati*, 946 F.2d 464 (6th Cir.1991), *cert. granted*, — U.S. —, 112 S.Ct. 1290, 117 L.Ed.2d 514 (1992), the Sixth Circuit held a city ordinance unconstitutional under the first amendment for failure to effect such a reasonable fit. The ordinance's ban of commercial handbill distribution on public property placed a substantially greater burden on commercial speech than was necessary to further the city's stated goals of alleviating aesthetic and safety concerns related to the proliferation of newsracks on city streets.

Though commercial speech sometimes receives lessened protection, it does not follow that commercial speech has a low value in first amendment jurisprudence. The court in *Discovery Network* identified only two types of cases in which commercial speech received less protection: regulations against commercial speech believed to be false or misleading, and regulations against speech because of perceived adverse effects its content has on the community. *Id.* at 471. The ordinance challenged in *Discovery Network* did not regulate content, nor alleviate a harm caused by the content, of commercial speech. Rather, it burdened commercial speech because of the *manner* of delivering that speech. The

court concluded there was no reasonable fit between the heavy burden placed on plaintiffs (complete deprivation of access to city streets) and the benefit gained by the lawmakers ("paltry gains in safety and beauty"). *Id.* The court emphasized that the city's goals could be achieved by several means other than by prohibiting all newsracks that dispensed commercial speech. To alleviate the safety risk associated with the chains used to anchor the racks, for example, a regulation could require that the racks be bolted to the sidewalks. To remedy the problems associated with racks overcrowding the sidewalks, or being unsightly, regulations could mandate the size, color or number of racks allowed. Each of these options could achieve the legislators' desired result without burdening commercial speech as heavily as the challenged ordinance.

This same reasoning appears applicable here. The TCPA does not restrict commercial speech because of its content or because of the content's effect on the community. Rather, the statute appears to burden one form of commercial speech (prerecorded messages) because of harms caused by the manner of their delivery. Serious questions are raised concerning whether there is a reasonable fit between the asserted purpose of the TCPA—enhanced residential privacy—and the means employed: a ban of prerecorded commercial speech delivered without an operator.

Carl R. Kolker, a manufacturer of automatic dialing systems, testified at the 17 December hearing that the vast majority of the telemarketing calls currently being placed would be unaffected by the TCPA. He estimated that at least 90 percent of these kinds of calls were placed by "predictive dialer systems," computers that dial many telephone lines at once and transfer answered calls to operators, who either deliver messages or invite the recipient to listen to prerecorded messages. The TCPA does not ban these types of calls; it instead restricts the direct transmittal of recorded messages directly, without first requesting the listener's consent. Kolker estimated that these types of calls made up 10 per-

cent of the telemarketing business. This evidence was unrefuted by defendants.

The statute also exempts other types of directly transmitted recorded messages. Direct transmittal of recorded commercial messages is permitted if the caller is a tax exempt nonprofit organization. 47 U.S.C. § 227(a)(3)(C). Non-commercial speech delivered in this manner is also permitted. 47 U.S.C. § 227(b)(2)(B)(i). Under the statute, therefore, non-commercial speech and even some commercial speech is unaffected and may be prerecorded and delivered by a telecomputer without an operator. The statute burdens only that commercial speech which is completely prerecorded and delivered for the purposes of realizing a profit. Yet non-commercial and nonprofit commercial prerecorded calls inflict the same degree of disturbance upon residential privacy as commercial prerecorded calls. They present the same concerns with filling answering machines and interfering with emergency, governmental and business telephone numbers that Congress noted specifically regarding the delivery of prerecorded commercial messages without operators.

The "end" targeted by the TCPA, therefore, would be a slight reduction in the number of unsolicited, invasive commercial calls placed to residential telephone subscribers. The means of accomplishing this, however, is the total suppression of commercial speech from businesses which transmit prerecorded messages and fail to use operators to introduce or read the messages—while non-commercial speech and commercial speech delivered by nonprofit organizations is permitted. There are serious questions raised as to whether such a heavy burden upon this one kind of constitutionally protected commercial speech is an appropriate or reasonable fit to the limited accomplishment of reducing such a small percentage of the invasive calls targeted by Congress.

Furthermore, less burdensome options appear to be available that would address the concerns Congress expressed regarding calls being made to business lines, emergency care providers, and government agencies, and calls not disconnecting after engaging answering machines. Uncontroverted testimony presented at the hearing suggested that technological advances have been made in the telemarketing industry that alleviate many of these concerns. Congress could have required the automatic dialing devices to employ this advanced technology to reduce the interference to business lines, emergency care providers, government agencies, and answering machines. As noted above, the existence of less burdensome options was significant to the court in *Discovery Network*. The existence of such options in this case is equally significant.

### b. Balance of Hardships

Upon determining that serious questions exist, the court must grant a preliminary injunction if it finds that the balance of hardships tips sharply in favor of the moving party. *Associated General Contractors*, 950 F.2d at 1411. Defendants assert that Congress served a strong public interest in curtailing telemarketing abuses and protecting residents from invasions of privacy. If enforcement of the TCPA were enjoined, defendants claim that the balance of hardships would favor them because the public would continue to suffer these invasions of privacy Congress sought to prevent.

According to the evidence presented, the TCPA would—at best—eliminate only one of every ten telemarketing calls made. The enhanced privacy would be even less significant if the for-profit automatic dialers silenced by the statute were subsequently put to use by those exempted from the effects of the law, *e.g.*, tax exempt nonprofit organizations. Therefore, the hardship defendants speak of is the further delay in eliminating one of every ten or more telephone solicitations a person may receive.

While this court in no way diminishes the stated intent of Congress, and shares the respect for privacy and the desire to be protected from unsolicited interruptions in the home, the court cannot conclude that defendants' projected hardship of allowing one additional solicitation outweighs the po-

**546**

tential hardship that would be imposed upon plaintiffs. The Supreme Court and the Ninth Circuit have recognized that the loss of first amendment freedoms—even for a short period—can constitute irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (plurality opinion); *San Diego Committee*, 790 F.2d at 1473 n. 3. This court shares the reasoning in *Elrod* and *San Diego Committee* and agrees that first amendment infringements can have a profound impact, and regards the loss of plaintiffs' rights to express one form of commercial speech as a significant hardship.

Plaintiffs also presented evidence and testimony suggesting that enforcement of the TCPA would cause dramatic drops in revenue and would probably result in the loss of livelihoods. Mrs. Moser testified that 70 percent of her business was attributable directly to the use of the telecomputer system. This court finds that the balance of hardships tips sharply in plaintiffs' favor.

CONCLUSION

Having found that serious questions are raised by plaintiffs in this action, and that the balance of hardships tips strongly in plaintiffs' favor, this court grants plaintiffs' motion for a preliminary injunction enjoining the enforcement of 47 U.S.C. § 227(b)(1)(B), pending a determination of the constitutionality of the statute.

ORDER OF PRELIMINARY INJUNCTION

The Court granted plaintiffs' motion for a preliminary injunction in an Order filed December 18, 1992, based on the Court's findings that:

1. Plaintiffs have raised serious questions about the constitutionality of 47 U.S.C. § 227(b)(1)(B).

2. The balance of hardships tips strongly in plaintiffs' favor, because of the infringement of first amendment rights and economic impact on plaintiffs created by 47 U.S.C. § 227(b)(1)(B).

Now, therefore, it is ORDERED as follows:

1. Defendants are enjoined and restrained from enforcing 47 U.S.C. § 227(b)(1)(B) during the pendency of this action. This injunction is not limited geographically, but applies to defendants wherever their jurisdiction extends.

2. Because this preliminary injunction carries no risk of monetary loss to defendants, plaintiffs are not required to post security. *U.S. v. State of Oregon*, 675 F.Supp. 1249, 1253 (D.Or.1987).